UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

LINDA DIFILLIPPO,

                          Plaintiff,

     -against-                                          6:09-CV-760
                                                        (NAM/ATB)
SPECIAL METALS CORPORATION and
DAVID MARECEK,

                          Defendants.
_____

APPEARANCES:                           OF COUNSEL:

Bosman Law Firm, L.L.C.                A.J. Bosman, Esq.
6599 Martin Street                     Beth A Lockhart, Esq.
Rome, New York   13440
*Attorneys for Plaintiff*

Bond Schoenck & King, P.L.L.C.         Brian J. Butler, Esq.
One Lincoln Center                     Colin M. Leonard, Esq.
Syracuse, New York  13202-1355
*Attorneys for Defendants*

**Norman A. Mordue, Chief U.S. District Judge**

MEMORANDUM-DECISION and ORDER

I.      INTRODUCTION

        In this action, plaintiff asserts that she was subjected to unlawful discrimination by

defendants based on her sex in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"),

42 U.S.C. § 2000e *et seq.* and based on her disability in contravention of the Americans with

Disabilities Act ("ADA"), 42 U.S.C. Section 12101 *et seq.*.  Plaintiff's complaint also asserts

unlawful discrimination claims pursuant to the New York Human Rights Law ("NYHRL"),

breach of contract and intentional tortious acts by defendant Marecek arising under New York

state law.  Defendants move for summary judgment dismissing plaintiff's claims on various

grounds.  Plaintiff opposes defendants' motion.

II.       RELEVANT FACTUAL BACKGROUND

Defendant Special Metals Corporation is located in New Hartford, New York, and currently employs approximately 370 people.  The company develops and produces nickel and cobalt alloys for components and parts for a variety of products in various industries around the world.  During all times relevant to the present action, defendant David Marecek was employed by Special Metals as Operations Manager of the Bar Mill Production department at the plant. Plaintiff Linda DiFillippo began working at Special Metals in August 2005, and after a period of training was signed to the Bar Mill department.  The Bar Mill is an area of Special Metals' New Hartford facility which is its own production area separate and apart from the Main Plant production area.  The Main Plant production area produces the alloys and then casts large bars or blocks, which are referred to as billots and ingots.  The billots and ingots are then sent to the Bar Mill for further processing.

Certain employees at Special Metals, including plaintiff, are represented for purposes of collective bargaining by the International Association of Machinists and Aerospace Workers and Local Lodge 2310.  At all times relevant to the complaint herein, the union had a collective bargaining agreement ("the Agreement") with Special Metals that defined "seniority" as "preference in employment, based on the length of continuous service in the plant, in jobs in a line of promotion (including single-sequence, non "bumpable" jobs) and the qualification and ability of the employee to perform the work involved."  Upon hire, each employee is assigned a "clock number" which fixes his or her seniority for job placement, promotion and layoff - - the lower an employee's clock number, the more senior that employee is.

There are 18 different lines of promotion established pursuant to the Agreement.  Each line of promotion pays a specific contractual wage rate.  Because the New Hartford facility runs on a 24-hour/7-day production schedule, the employees are divided into different job groups and

2

each job group is assigned to particular shifts to provide coverage for the 24/7 operation.  The

process of placing employees within departments and groups within a particular line of promotion

is referred to throughout the Agreement as the "manning" process.  The placement of employees

through the "manning" process is controlled by the Agreement between the company and the

union and by associated practices developed between the parties over the years.  Barbara A.

Tarnawa has been employed at Special Metals since 1974 and has been charged with

responsibility for the "manning" process at the plant for in excess of twenty-five years.

Employees who work in the Utility line of promotion are classified at Special Metals as

Plant Utility employees.  A Plant Utility employee is responsible for performing a number of job

functions, working with a variety of materials and using a variety of tools to perform those

functions.  According to defendants, the primary functions of a Plant Utility employee are as

follows:

> (a) Utilize pneumatic grinder to remove surface defects and prepare
> various intermediate mill products for additional processing.
> (b) Utilize grinder to remove material from ingots, electrodes, and
> billets.
> (c) Move and/or weigh and locate material and equipment.
> (d) Operate overhead cranes and load and unload machinery.
> (e) Transport and weigh material.
> (f) Transport scrap, and trash, etc.
> (g) Keeps assigned areas in a clean, orderly condition.
> (h) Operate grit blaster equipment to clean surfaces of various sizes
> bar, billet, and ingot material.
> (i) Operate pneumatic chipping hammer to remove cans from billets.
> (j) Add oil to reservoirs.
> (k) Perform general work involving minor maintenance and repair.
> (1) Assists in the installation and dismantling of equipment.
> (m) Operates small vehicles to maintain grounds.
> (n) Operate spot grinder.
> (o) Operate cutting torch.

Plaintiff disputes defendants' assertion that hand grinding is a standard of performance for Plant

Utility employees.  Plaintiff contends that although there are "supposed to be a certain number of

people on a shift who are capable of hand grinding," it "depends on the foreman and whether he

likes the worker."  Plaintiff asserts that "management plays games with the standards for employees."

The Plant Utility position is broken down into several different departments: (a) Bar Mill Production; (b) Bar Mill Maintenance; (c) Main Plant Production; (d) Main Plant Maintenance; and (e) Janitorial.  According to defendants, employees are placed in jobs through the "manning" process, taking into account the company's needs, along with the seniority and group preference of each employee, as well as any applicable work restrictions.  An employee's group preference is communicated to Special Metals' Human Resources Department through a form, titled "Hourly Employee Action Request," upon which an employee ranks his or her preferred job group. Each department within Plant Utility performs different functions.  According to defendants, the general job duties of employees who work in the several Plant Utility departments are as follows:

(a) Bar Mill Production (department 652) - - utilize a pneumatic grinder to remove surface defects and prepare various intermediate mill products for additional processing; utilize a grinder to remove material from ingots, electrodes, and billets; move and/or weigh and locate material and equipment; operate overhead cranes and load and unload machinery; transport and weigh material; transport scrap, and trash, etc; keep assigned areas in a clean, orderly condition; operate a grit blaster equipment to clean surfaces of various sized bar, billet, and ingot material; operate a pneumatic chipping hammer to remove cans from billets; operate small vehicles to maintain grounds; and operate spot grinder.  Based upon the level of production in the Bar Mill, the need for employees who are capable of hand grinding can vary on a week to week basis.

(b) Bar Mill Maintenance (department 660) - - Move and/or weigh and locate material and equipment; keep assigned areas in a clean, orderly condition; add oil to reservoirs; perform general work involving minor maintenance and repair; assist in the dismantling of equipment; and operate a cutting torch.

(c) Main Plant Production (departments 833 and 852) - - Employees in department 833 (ViC grinding) are required to: utilize a pneumatic grinder to remove surface defects and prepare various intermediate mill products for additional processing; utilize a grinder to remove material from ingots, electrodes, and billets; move and/or weigh and locate material and equipment; operate overhead cranes and load and

unload machinery; transport and weigh material. Employees assigned to department 852 are required to transport scrap, and trash, etc.; and keep assigned areas in a clean, orderly condition. As with the Bar Mill Production department, the need for employees who are capable of ViC grinding varies on a week-to-week basis based upon the production level.

(d) Main Plant Maintenance (department 860) - - Move and/or weigh and locate material and equipment; keep assigned areas in a clean, orderly condition; add oil to reservoirs; perform general work involving minor maintenance and repair; assist in the dismantling of equipment; and operate a cutting torch.

(e) Janitorial - - Transport scrap, and trash, etc. and keep assigned areas in a clean, orderly condition.

Based upon the distribution of tasks among the various departments, only the Bar Mill Production and Main Plant Production departments involve hand grinding.

In accordance with the Agreement, employees within Plant Utility earn the same wage (depending on years of service), irrespective of the department in which they work. Employees assigned to the Janitorial department earn an hourly wage that is slightly less than the other Plant Utility positions. As referenced above, plaintiff was hired in August 2005 for the Plant Utility position in the Utility line of promotion. Upon her hire, plaintiff was assigned a clock number of 529700.

In November 2005, plaintiff bid on and - based on her seniority - was later awarded a job opening in Cold Finish, which is in the Cold Finish line of promotion. She began training for her new job in January 2006. On February 28, 2006, while working in Cold Finish, plaintiff sustained an injury to her left hand when she caught it in a piece of machinery and went out of work as a result of her injury. On May 22, 2006, plaintiff was released to light duty work with a six week limitation on the use of her left hand. On May 30, 2006, plaintiff returned to work pursuant to Special Metals' Modified Work Program in the same Cold Finish department that she had been in at the time of her injury. The Modified Work Program at Special Metals is a program

5

whereby Special Metals offers modified work, whenever feasible, to employees whose activity has been temporarily limited by physicians' orders due to an on-the-job or off-the-job accident or illness.

On or about June 21, 2006, plaintiff was released to full duty by her physician.  On June 21, 2006, plaintiff requested a demotion from Cold Finish back to her Plant Utility position and that request was granted by Special Metals on June 26, 2006.  Plaintiff worked in Plant Utility from July 3, 2006, to October 26, 2006, when plaintiff's physician restricted the use of her left hand at work.  Plaintiff requested and was provided a sick leave of absence related to this restriction.  On November 29, 2006, plaintiff presented Special Metals with a "no hand grinding" restriction from her physician.  On December 4, 2006, plaintiff returned to work from her sick leave of absence to her Plant Utility position under the Modified Work Program.  When she returned to work, plaintiff could perform all functions of the Plant Utility position with the exception of hand grinding.

Plaintiff was laid-off in December 2007 as a result of a company-wide reduction in force which caused fourteen employees, including plaintiff, to be laid off from the New Hartford facility.  At the time of her layoff, plaintiff was working in Plant Utility, in Main Plant Maintenance, a position that did not require hand grinding.  Plaintiff  was recalled from layoff on March 30, 2008 into the same Plant Utility position that she occupied before the layoff - - i.e. Main Plant Maintenance.  On April 16, 2008, Ms. DiFillippo submitted an Hourly Employee Action Request to the Human Resources Department changing her group preferences which was approved and became effective on April 28, 2008.  On her Action Request form, plaintiff listed her group preferences as follows:

| 5 | 4 | 6 | 1 | 3 | 7 | 2 |
|---|---|---|---|---|---|---|
| 1st | 2nd | 3rd | 4th | 5th | 6th | 7th |

On April 28, 2008, plaintiff and all of the other employees in Plant Utility were subject to

the "manning" process.  Defendants assert that during the "manning" process, Ms. Tarnawa took into account plaintiff's seniority, her group preference and her hand grinding restriction and ultimately assigned plaintiff to Group 6 in the Janitorial department, her third choice for group preference.  Defendants' counsel summarized the process Ms. Tarnawa used to place plaintiff in the Janitorial department for that week as follows:

> Because [plaintiff's] first group preference for the week of April 28, 2008 was Group 5, Ms. Tarnawa first looked at the staffing needs for that group. Group 5 needed four employees in the Bar Mill Production department only. Based upon the demand at that time for hand grinding, all four of the employees needed for Bar Mill Production had to be able to perform the hand grinding function. Because of her work restriction, [plaintiff] was not eligible to work in the Bar Mill Production department at this time.

> As such, Ms. Tarnawa then looked at the staffing needs for Group 4 which was [plaintiff's] second group preference. Group 4 needed one employee in the Main Plant Maintenance department, one employee in ViC Grinding and one Janitor. The two employees senior to Ms. DiFillippo in Group 4 were James Perri (Clock No. 524000), who is permanently assigned to the Janitorial department, and Kyle Thurston (Clock No. 527300), who also had a hand grinding restriction. Accordingly, the only position available in Group 4 for [plaintiff] for the week of April 28, 2008 was the ViC Grinding position which she could not perform because of her hand grinding restriction.

> As such, Ms. Tarnawa then looked at the staffing needs for Group 6 which was [plaintiff's] third group preference. Group 6 needed a total of ten employees which included: four in Bar Mill Production, one in Bar Mill Maintenance; two in Main Plant Maintenance; one in Main Plant Production; one in ViC Grinding and one in Janitorial. Of the ten employees in Group 6 for the week of April 28, 2008, [plaintiff] was the least senior and, based upon her seniority, she was assigned to the Janitorial department for that week.

Plaintiff contends in her response to defendants' Statement of Material Facts that contrary to Ms. Tarnawa's statement concerning the reason for changing plaintiff's placement, she was assigned to the Janitorial department after she was involved in an "incident" with defendant Marecek.  To wit, she claims that after she dropped a billet on the floor, Marecek screamed at and berated her. However, it is undisputed that the reassignment to the Janitorial department occurred on April 28,

2008, and the "incident" with Marecek did not occur until one month later, on May 28, 2008.

Plaintiff worked in the Janitorial department for a single week.  During that week, plaintiff made $ 1.30 less per hour for regular time and $1.95 less per hour for overtime compared to what she would have earned had she been assigned to one of the other Plant Utility departments.  On April 30, 2008, plaintiff's physician submitted a Return to Work Slip to Special Metals stating that plaintiff "may return to work on 04/30/2008 with the following restrictions: none.  Linda may use the hand grinder for work."  Plaintiff asserts that she was forced to obtain this release of work restrictions from her doctor because defendant Marecek told her that if she did not have her hand grinding restriction lifted she would lose her job.  On May 5, 2008, pursuant to the "manning" process based upon her seniority and group preference, Ms. DiFillippo resumed work in the Plant Utility position assigned to the Bar Mill Production department.

Pursuant to the Agreement, plaintiff had the right to bring any perceived errors in her group assignment through the "manning" process to the Human Resources Department.  Pursuant to the Agreement, plaintiff could grieve her assignment to a particular group or department through the Grievance Procedure set forth in Article VIII of the Agreement.  Plaintiff never brought any alleged errors in her group assignment through the "manning" process to the Human Resources Department and never filed a grievance with respect to her assignment to a particular group or department within Plant Utility.

As referenced above, plaintiff dropped a billet on May 28, 2008, which weighed approximately 700 - 800 pounds, onto the floor while attempting to move billets from the 13-inch saw table, located in the Bar Mill.  The accident occurred at 7:20 a.m., right before the end of the shift.  Plaintiff was attempting to secure a load of billets on the 13-inch saw table with an overhead crane and, when she lifted up the crane, one of the billets fell off of the saw table and landed on the floor.  Defendant Marecek was in the area of the Bar Mill where the billet fell.  he

asserts that he went over to plaintiff to ask her what had happened.  Plaintiff alleges that Marecek

"went beserk" on her, going "crazy" and "scream[ing] at her" in front of her co-workers.  Shortly

after Mr. Marecek approached plaintiff, she left the scene of the incident to get union

representation.  When plaintiff returned to the scene with a union representative, defendants claim

that a discussion took place about how and why the billet fell.  Plaintiff asserts that Marecek

attempted to "humiliate" her by "recreat[ing] the accident.  At 7:50 a.m., plaintiff left the scene

and punched out of work at 7:51 a.m..  She asserts that she was so overwrought with anxiety

following the confrontation with Marecek that she was unable to complete a four hour overtime

shift.

Plaintiff requested a medical leave from work on June 9, 2008, at the suggestion of her

doctor due to an "anxiety disorder" and "panic attacks" allegedly brought on by being

"harass[ed]" by Marecek.  Special Metals granted plaintiff's request and she remained on sick

leave until December 8, 2008, when she returned to work in the same position in the Bar Mill

Production department that she occupied before her sick leave.  Plaintiff worked in that position

until February 2, 2009, when she was laid off again along with 41 other employees at the New

Hartford facility.

Plaintiff filed a Charge of Discrimination (the "Charge") with the Equal Employment

Opportunity Commission ("EEOC") on August 14, 2008.  In the Charge, plaintiff alleged the

following:

> I am an individual with a disability covered under the provisions of the
> Americans with Disabilities Act.  I began working for the above-
> named Respondent on or about August 5, 2005.  My current/recent
> position with the Respondent was a Grinder in the Utility Department.
>
> In or around February 28, 2006, I sustained a work related injury.  As
> a result, a no grinding restriction was imposed on my by my attending
> physician.  I was able to work with this restriction for almost 2 years,
> until I was laid off.

On or about March 30, 2008, when I returned from having been laid off, I was denied a return to my normal duties, being placed in maintenance and then janitor. I was also informed by the foreman of Utility that I would not be allowed to work in Utility, unless my restriction was lifted.

Although I voluntarily had the restriction removed, I was forced to have it reinstated because it exacerbated my condition. Upon information and belief, male employees have been allowed to work in Utility with restrictions similar to my own.

Additionally, from on or about March 30, 2008, through on or about May 18, 2008, Respondent failed to pay me the prevailing wages for the jobs that I had been assigned, as per the Collective Bargaining Agreement (CBA).

On or about May 28, 2008, I was the target of a verbal tirade at the hands of the foreman, in front of my peers. Because of the harassment, I was forced to disability leave.

I believe I have been harassed, intimidated and subjected to a hostile work environment, denied a reasonable accommodation, and subjected to different terms and conditions of employment because of my disability and gender, in violation fo the Americans with Disability Act and Title VII of the Civil Rights Act of 1964, as amended.

In the Charge, the box entitled "Discrimination Based on" indicated plaintiff was alleging she was discriminated against on the basis of her sex and disability. In her "Intake Questionnaire," dated June 18, 2008, however, plaintiff had also checked the box indicating discrimination based on retaliation. In a letter to EEOC dated July 2, 2008, plaintiff also indicated she had been treated differently from fellow employees in being denied safety equipment including work boots and properly fitting gloves.

EEOC investigated the Charge and on October 16, 2008, the agency sent a letter to plaintiff stating that Special Metals had met its burden of proving a nondiscriminatory defense to the allegations contained in the Charge. The EEOC directed plaintiff to provide additional information by November 7, 2008, establishing that the Company's asserted defenses were "pretextual" and disguised to cover up discrimination. Plaintiff never provided this information to

the EEOC.  Plaintiff's counsel asserts that plaintiff's failure to provide the requested information

is irrelevant since she had requested a "Right to Sue" letter from EEOC on December 18, 2008,

prior to the agency completing it's investigation.  EEOC mailed plaintiff a "Right to Sue" notice

on February 23, 2009.

Plaintiff filed the present action by service of a Summons with Notice on May 26, 2009, in

Oneida County Supreme Court whereupon defendants removed the case to this Court.  The

complaint alleged that plaintiff suffered damages due to defendants' discriminatory and

retaliatory policies.  Specifically, plaintiff asserted:

> Such acts and policies are illegally imposed on the Plaintiff by the
> Defendants employing and endorsing practices and policy which
> subjects women to greater scrutiny in their employment and treats
> women as second class citizens and disparately excludes women and
> disabled women from certain traditionally male assignments, positions
> of visibility, authority and power, and denies women and disabled
> women assignments, equipment, and accommodations which lead to
> equal supervisory and management opportunities.  Denying women
> access to work equipment and assignments leads to lower regard,
> lower pay and fewer benefits for all women.

In addition, plaintiff alleged in her complaint that defendants 1) "subject women to stricter

scrutiny and application of guidelines in the use of sick time, workplace injury, assignments, and

conduct;" and 2) "subject females to higher standards of performance and adherence to rules and

regulations while excusing men from the same standards of behavior."

With respect to defendant Marecek, plaintiff claims that Marecek subjected her to

disparate treatment under the ADA, Title VII and the NYHRL when he prohibited plaintiff from

working in her department due to her sex and/or disability on March 30, 2008, even though male

employees were routinely accommodated and/or allowed modified or restricted duties and

assignments due to injury or disability.  Plaintiff also asserts that defendant Marecek subjected

her to a hostile work environment under the ADA, Title VII and the NYHRL when he yelled,

screamed at and humiliated plaintiff for approximately 40 minutes on the floor in front of her co-

workers.  In her seventh cause of action, plaintiff asserts that Marecek's "extreme, outrageous, intentional and/or reckless" conduct amounts to an intentional tort.  The eighth cause of action alleges that defendants breached plaintiff's employment contract by subjecting her to discriminatory treatment.  Finally, in her ninth claim, plaintiff alleges that defendants subjected her to "retaliation for requesting accommodation and for requesting suitable and appropriate gear equal to her male counterparts."  To wit, the complaint asserts defendants "refused to provide Plaintiff with equal and suitably safe work gear and instead took away her accommodation for her disability and subjected her to a hostile work environment."

III.    DISCUSSION

A.    <u>Summary Judgment Standard</u>

Summary judgment is appropriate where there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.  *See* Fed. R. Civ. P. 56(c).  Substantive law determines which facts are material; that is, which facts might affect the outcome of the suit under the governing law.  *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 258 (1986). Irrelevant or unnecessary facts do not preclude summary judgment, even when they are in dispute.  *See id.*  The moving party bears the initial burden of establishing that there is no genuine issue of material fact to be decided.  *See Celotex Corp v. Catrett*, 477 U.S. 317, 323 (1986).  With respect to any issue on which the moving party does not bear the burden of proof, it may meet its burden on summary judgment by showing that there is an absence of evidence to support the nonmoving party's case.  *See id.* at 325.  Once the movant meets this initial burden, the nonmoving party must demonstrate that there is a genuine unresolved issue for trial.  *See* Fed. R. Civ. P. 56(e).

Although the trial court must resolve all ambiguities and draw all inferences in favor of that party against whom summary judgment is sought, *see Ramseur v. Chase Manhattan Bank*,

865 F.2d 460, 465 (2d Cir. 1989); *Eastway Constr. Corp. v. City of New York*, 762 F.2d 243, 249

(2d Cir. 1985), the motion will not be defeated by a non-movant who raises merely "metaphysical

doubt" concerning the facts or who only offers conjecture or surmise.  *See Delaware & H. R. Co.*

*v. Consolidated Rail Corp.*, 902 F.2d 174, 178 (2d Cir. 1990) (quoting *Matsushita Elec. Indus.*

*Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)).  Indeed, the nonmoving party's opposition

may not rest on mere denials of the moving party's pleading, but "must set forth specific facts

showing there is a genuine issue for trial."  *See* Fed. R. Civ. P. 56(e).

  With respect to summary judgment in employment discrimination cases, courts have

acknowledged "direct evidence of . . . discriminatory intent will rarely be found."  *Schwapp v.*

*Town of Avon*, 118 F.3d 106, 110 (2d Cir. 1997) (citations and internal quotation marks omitted).

Thus, "affidavits and depositions must be carefully scrutinized for circumstantial proof which, if

believed, would show discrimination."  *Id.*  A plaintiff must, however, provide more than

conclusory allegations of discrimination to defeat a motion for summary judgment.  *See id.*

The standard for granting summary judgment mirrors the directed verdict standard under Rule

50(a) which requires the court to grant a directed verdict where there can be but one reasonable

conclusion.  *See Anderson,* 477 U.S. at 250.  "It is a gratuitous cruelty to parties and their

witnesses to put them through the ordeal of a trial when the outcome is foreordained."  *See Mason*

*v. Continental Ill. Nat'l Bank*, 704 F.2d 361, 367 (7th Cir. 1983).  It is with these considerations

in mind that the Court addresses defendants' motion for summary judgment.

B. Claims Against Individual Defendants

  Defendants seek dismissal of the Title VII claims against defendant Marecek on the

ground that the statute applies as a matter of law only to "employers" and not individual

defendants.  *See* 42 U.S.C. § 2000e(b); *Tomka v. Seiler Corp.*, 66 F.3d 1295, 1313 (2d Cir. 1995).

Likewise, Plaintiff's ADA claims against Marecek individually are not cognizable.  "[N]either

Title II of the ADA nor § 504 of the Rehabilitation Act provides for individual capacity suits...."

*Garcia v. State Univ. of N.Y. Health Scis. Ctr.*, 280 F.3d 98, 107 (2d Cir. 2001); *see also Walker v. Snyder*, 213 F.3d 344, 346 (7th Cir. 2000) ("[i]n suits under Title II of the ADA, as under many other federal anti-discrimination laws, such as Title VII and the ADEA, the proper defendant usually is an organization rather than a natural person.").

C.      Disability Discrimination under the ADA and NYHRL

The ADA prohibits discrimination by covered entities, including private employers, against "qualified" individuals with a disability.  Specifically, it provides that no "covered" employer shall "discriminate against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment."  42 U.S.C. § 12112(a).  A "qualified individual with a disability" is identified as "an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8).   In turn, a "disability" is defined as: "(A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment."  42 U.S.C. § 12102(2).  Accordingly, to fall within this definition one must have an actual disability, a record of a disability, or be regarded as having one.[1]  The ADA defines "major life activities" to include

---

[1]     Subsequent to passage of the ADA, EEOC issued regulations to provide additional guidance regarding the proper interpretation of the term "disability."  The regulations define the three elements of disability:  (1) "physical or mental impairment," (2) "substantially limits," and (3) "major life activities."  29 C.F.R. §§ 1630.2(h)-(j) (1998).  Under the regulations, a "physical impairment" includes "[a]ny physiological disorder, or condition, cosmetic disfigurement, or anatomical loss affecting one or more of the following body systems:  neurological, musculoskeletal, special sense organs, respiratory (including speech organs), cardiovascular, reproductive, digestive, genito-urinary, hemic and lymphatic, skin, and endocrine."  *Id.* at § 1630.2(h)(1).   The term "substantially limits" means, among other things, "[u]nable to perform a major life activity that the average person in the general population can perform;" or "[s]ignificantly restricted as to the condition, manner or duration under which an individual can perform a particular major life activity as compared to the condition, manner, or duration under which the average person in the general population can perform that same major life

"caring for oneself," as well as "thinking, communicating, and working."  *Id.* at § 12102(2)(A).

However, "[m]erely having an impairment does not make one disabled for purposes of the ADA."

*Toyota Motor Mfg. v. Williams*, 534 U.S. 184, 195 (2002).[2]

1.     Burden of Proof

       In *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), the Supreme Court

established the framework for analyzing employment discrimination claims.  Although

*McDonnell Douglas* involved a race discrimination claim brought under Title VII, courts have

applied the same framework to disability discrimination claims brought under the ADA and the

NYHRL.  *See, Platt v. Inc. Vill. of Southampton*, 391 Fed. Appx. 62, 64 n. 1 (2d Cir. 2010);

*Reeves v. Johnson Controls World Servs.*, 140 F.3d 144, 156 n. 9 (2d Cir. 1998) (citation

omitted).  Under the *McDonnell Douglas* framework, a plaintiff must carry the initial burden of

establishing a *prima facie* case of discrimination.  *See* 411 U.S. at 802.  If the plaintiff succeeds in

establishing a *prima facie* case, the defendant employer must then articulate "some legitimate,

nondiscriminatory reason" for the alleged adverse employment decision.  *Id.*  If the defendant

employer articulates a legitimate, nondiscriminatory reason for the purported unlawful action, the

_____

activity."  *Id.* at § 1630.2(j).  Finally, "[m]ajor [l]ife [a]ctivities means functions such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working."  *Id.* at § 1630.2(i).

[2]

*Williams* has been expressly superseded by an intervening act of Congress.  *See* ADA Amendments Act of 2008, Pub.L. No. 110-325, 112 Stat. 3353 (2008).  The ADA amendments expanded significantly the definition of what constitutes a "disability" under the Act.  However, there is no indication that Congress intended the ADA Amendments to have retroactive effect. *See Fernandez-Vargas v. Gonzales*, 548 U.S. 30, 37 (2006) (noting "a statute shall not be given retroactive effect unless such construction is required by explicit language or by necessary implication") (internal quotation marks omitted).  Accordingly, this Court relies on the ADA as it existed at the time of the relevant events which, according to plaintiff's complaint, was in 2008. *See, e.g., White v. Sears, Roebuck & Co.*, No. 07-CV-4286, 2009 WL 1140434, at *5 (E.D.N.Y. Apr. 27, 2009); *Geohan v. Long Island R.R.*, No. 06-CV-1435, 2009 WL 982451, at *9 (E.D.N.Y. Apr. 9, 2009); *Kravar v. Triangle Servs.*, No. 06-CV-7858, 2009 WL 805807, at *4 n. 3 (S.D.N.Y. Mar. 27, 2009) ("[T]his Court joins other courts that have held that the Amendments Act's definition of "disability" does not apply to conduct that occurred before January 1, 2009."); *Moran v. Premier Educ. Group, L.P.*, 599 F.Supp.2d 263, 271 (D.Conn. 2009); *Levy v. Hustedt Chevrolet*, No. 05-CV-4832, 2008 WL 5273927, at *3 n. 2 (E.D.N.Y. Dec. 17, 2008); *Gibbon v. City of New York*, No. 07-CV-6698, 2008 WL 5068966, at *5 n. 47 (S.D.N.Y. Nov. 25, 2008).  Plaintiff asserts that the Court should use the new and expanded definition of "disability" as it appears in the ADA Amendments based on the fact that "defendants' adverse employment actions continued well past January 1, 2009."  However, the Court notes that the complaint has not been amended to include any alleged unlawful acts past May 28, 2008.

plaintiff is then afforded a fair opportunity to show that the employer's stated reason for the adverse employment action was in fact pretext for discrimination. *Id.* at 804.

To state a *prima facie* case of discrimination under the ADA, a plaintiff must demonstrate that: 1) he or she suffers from a disability within the meaning of the ADA; 2) that he or she was otherwise qualified to perform his or her job or a job he or she was applying for; and 3) that he or she was not hired for the job, was discharged or suffered some other adverse employment action because of a disability. *Wernick v. Fed. Reserve Bank of New York,* 91 F.3d 379, 383 (2d Cir. 1996).

2.    Plaintiff's Status as "Disabled" under the ADA

Defendants contend that plaintiff does not have a qualified disability under the ADA. To qualify as disabled under the ADA, a claimant must show that his or her claimed limitation on a major life activity is "substantia[l]." 42 U.S.C. § 12102(2)(A); *Toyota Motor Mfg*., 534 U.S. at 196:

> "[S]ubstantially" in the phrase "substantially limits" suggests "considerable" or "to a large degree." *See* WEBSTER'S THIRD NEW INT'L DICTIONARY 2280 (1976) (defining "substantially" as "in a substantial manner" and "substantial" as "considerable in amount, value, or worth" and "being that specified to a large degree or in the main"); *see also* 17 OXFORD ENGLISH DICTIONARY 66–67 (2d ed.1989) ( "substantial": "[r]elating to or proceeding from the essence of a thing; essential"; "[o]f ample or considerable amount, quantity, or dimensions"). The word "substantial" thus clearly precludes impairments that interfere in only a minor way with the performance of manual tasks from qualifying as disabilities. ...
>
> "Major" in the phrase "major life activities" means important. *See* WEBSTER'S, *supra*, at 1363 (defining "major" as "greater in dignity, rank, importance, or interest"). "Major life activities" thus refers to those activities that are of central importance to daily life. In order for performing manual tasks to fit into this category—a category that includes such basic abilities as walking, seeing, and hearing—the manual tasks in question must be central to daily life. If each of the tasks included in the major life activity of performing manual tasks does not independently qualify as a major life activity, then together they must do so.

16

*Id.* at 196-97.  "That these terms need to be interpreted strictly to create a demanding standard for qualifying as disabled is confirmed by the first section of the ADA, which lays out the legislative findings and purposes that motivate the Act."  *Id.* at 197 (citing 42 U.S.C. § 12101).  Indeed, the Supreme Court noted that "[w]hen it enacted the ADA in 1990, Congress found that 'some 43,000,000 Americans have one or more physical or mental disabilities.'"  *Id.* (citing 42 U.S.C. § 12101(a)(1)).  "If Congress intended everyone with a physical impairment that precluded the performance of some isolated, unimportant, or particularly difficult manual task to qualify as disabled, the number of disabled Americans would surely have been much higher."  *Id.* (citation omitted).

In the instant case, plaintiff alleges that the injury she sustained in 2006 to her left hand causes her to be "disabled" pursuant to the ADA.  In response to interrogatories which asked plaintiff to "(i)dentify the basis for your allegation in Paragraph 10 of the Complaint that you 'suffered from a disability within the meaning of the Americans with Disabilities Act,'" plaintiff responded:

> Plaintiff suffered a work-related hand injury in 2006 which has left her with 55% permanent loss of use of her left small finger, 55% permanent loss of use of her left index finger, and 5% loss of use of her left long finger.  As a result of said loss, Plaintiff's ability to properly and safely grasp items, lift items, and open containers has been limited.  Plaintiff can no longer crochet and knit as she did prior to her and injury and experiences difficulty cooking meals and grasping the steering wheel while driving.

Further, during her deposition, plaintiff testified that the injury to her left hand: 1) prevents her from picking up a frying pan, but not from cooking; 2) prevents her from crocheting or cross-stitching; 3) requires that she use one finger to type; 4) requires that she drive with her right hand, but does not prevent her from driving; 5) prevents her from holding the clutch on the lawn mower and holding a weed whacker; and 6) prevents her from pulling laundry out of a front-loading machine.  In terms of her ability to perform her duties at work, plaintiff testified that

she has a "difficult time" lifting standards, the machines that are used to sound check for deviations or cracks in manufactured material.  Plaintiff also stated that due to her injury, she has "difficulty" lifting slices, the material sent to the etching area or to the plate saw for quality testing.  It is also undisputed that plaintiff was, during most of the time relevant to this litigation, restricted from jobs that required her to perform hand grinding.

EEOC regulations also give guidance for determining whether an individual is substantially limited in the major life activity of "working." The ability to work is substantially limited (among other indicia) if the plaintiff is "significantly restricted in the ability to perform either a class of jobs or a broad range of jobs in various classes as compared to the average person having comparable training, skills and abilities." 29 C.F.R. § 1630.2(j)(3)(i).  The regulations make clear that "the inability to perform in a single, particular job does not constitute a substantial limitation in the major life activity of working."  *Id.*  Here, there is no evidence that plaintiff was prevented from performing any jobs outside of those that required hand grinding.  According to defendants, hand grinding was a function of one part of the Plant Utility job when an employee was assigned to the Bar Mill Production and Main Plant Production Departments.  Plaintiff acknowledged that she could perform the tasks in all of the other departments comprising the Plant Utility position, even if she had "difficulty" with some of them.  Since plaintiff was able to perform all of the functions of her own job except for hand grinding, she cannot establish that her left hand disability placed a significant restriction on her ability to perform an entire class of jobs or a broad range of jobs in various classes as required for establishing she is substantially limited in the major life activity of working under the ADA.  *See* 29 C.F.R. § 1630.2(j)(3)(I)*; see also Sutton v. United Air Lines, Inc.*, 527 U.S. 471, 492 (1999).

"To be substantially limited in performing manual tasks, an individual must have an impairment that prevents or severely restricts the individual from doing activities that are of

central importance to most people's daily lives." *Toyota Mfg.*, 534 US. at 198.  The impairment's

impact must also be permanent or long term.  *See id.*; *see also* 29 C.F.R. §§ 1630.2(j)(2)(ii)-(iii)

(2001).  In *Toyota Mfg.*, the plaintiff, though unable to do repetitive work with her hands and

arms extended at or above shoulder levels for extended periods of time, was still able to tend to

her personal hygiene and carry out personal and household chores.  Specifically, the district court

noted in *Toyota Mfg.* that at the time plaintiff sought an accommodation from defendant, she

admitted that she was able to do the manual tasks required by her original two jobs at the plant.

*See* 534 U.S. at 201.  In addition, according to plaintiff's deposition testimony, even after her

condition worsened, she could still brush her teeth, wash her face, bathe, tend her flower garden,

fix breakfast, do laundry, and pick up around the house.  *See id.*  The record also indicated that

her medical conditions caused her to avoid sweeping, to quit dancing, to occasionally seek help

dressing, and to reduce how often she played with her children, gardened, and drove long

distances.  *See id.*  The Supreme Court noted that these changes in her life "did not amount to

such severe restrictions in the activities that are of central importance to most people's daily lives

that they establish a manual task disability as a matter of law."  534 U.S. at 202.

  In the present case, the Court finds that likewise, plaintiff Defillippo's ability to perform

manual tasks does not amount to a substantial impairment of a major life activity.  She is still able

to cook, drive, type and care for herself and her family.  The limited tasks she is unable to do are

not the type of activities that are of "central importance to people's daily lives."  *Id.*

  Plaintiff also attempts to rely on the fact that it was medically determined that she has a

permanent partial disability in some of the fingers of her left hand to attain disability status under

the ADA.  However, "it is insufficient for individuals attempting to prove disability status under

this test ... merely [to] submit evidence of a medical diagnosis of an impairment."  *Toyota Motor*

*Mfg.*, 534 U.S. at 197.

As a further matter, plaintiff alleges for the first time in her opposition to defendants' motion for summary judgment that not only was she disabled under the ADA, but that defendants unlawfully "regarded" her as disabled under the ADA as well.  Defendants are correct when they argue that these claims are legally inconsistent.  One cannot be both disabled and regarded as disabled under the ADA at the same time since it is necessary that one have a recognized disability for the former claim and that a litigant be unlawfully treated as disabled when he or she is not for the latter type of claim.  *See Giordano v. City of New York*, 274 F. 3d 740, 748 (2d Cir. 2001) (an employee can be "regarded as" disabled in two ways: "(1) a covered entity mistakenly believes that a person has a physical impairment that substantially limits one or more major life activities, or (2) a covered entity mistakenly believes that an actual, nonlimiting impairment substantially limits one or more major life activities.")  This new claim must fail because it was never raised before the EEOC or at any time before now in the litigation.  Plaintiff cannot wait until defendants file their motion for summary judgment to introduce an entirely new and legally inconsistent theory of liability in this case.

Because plaintiff has failed to rebut defendants' proof that her alleged disability does not substantially limit a major life activity, she has failed to establish that she had a disability within the meaning of the ADA.  Consequently she has failed to establish a prima facie case of disability employment discrimination under the ADA and her claims must be dismissed.  Her disability discrimination claims under the NYHRL, however, remain intact.[3]

---

[3]

Defendants assert that plaintiff does not oppose dismissal of **either** of her NYHRL claims in her opposition papers - that is , her claims that defendants failed to accommodate her disability and that she was discriminated against "because of" a disability."  The Court disagrees.  As to the latter claim, plaintiff specifically argues - correctly - that the NYHRL does not require her to demonstrate that her disability substantially limits a major life activity as in the case of the ADA.  With respect to the former, although plaintiff does not expressly oppose dismissal of the claim, she does reference defendant's failure to allow her to use a specially ordered piece of equipment, i.e., a light weight hand grinding tool, that would have accommodated her hand grinding limitation.  Thus, the Court is hesitant to dismiss both of plaintiff's NYHRL claims at this juncture.

D.      Title VII Claims

1.      Gender Discrimination

Plaintiff asserts that she has been denied "benefits and privileges afforded to male employees in same or similar circumstances because of her sex."  In analyzing plaintiff's claims of gender discrimination under Title VII, the Court is obligated once again to review the record under the familiar burden-shifting analysis set out in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792.  As referenced above, the first step in the *McDonnell Douglas* formulation requires a plaintiff to prove, by a preponderance of the evidence, a *prima facie* case of discrimination or unlawful retaliation by the employer.  *See Bickerstaff v. Vassar Coll.*, 196 F.3d 435, 446-47 (2d Cir. 1999).  If plaintiff establishes a *prima facie* case, the burden of production shifts to the employer to articulate a legitimate, nondiscriminatory reason for its actions.  *Id.* at 446.  In the third step of the *McDonnell Douglas* process, the burden then shifts back to plaintiff to demonstrate that the proffered reason was not the true reason for the employment decision, and that discrimination was the true reason.  *See id.*

To establish a *prima facie* case of gender discrimination under Title VII and the NYHRL, plaintiff must demonstrate: (1) she belongs to a protected class; (2) she was qualified for her position and/or was performing her duties satisfactorily; (3) she suffered an adverse employment action; and (4) the adverse employment action occurred under circumstances giving rise to an inference of discrimination on the basis of her membership in that class.  *Feingold v. New York*, 366 F.3d 138, 152 (2d Cir. 2004).  It is undisputed that plaintiff is female and therefore is a member of a protected class.  Plaintiff asserted in the complaint that she was demoted by being assigned to the Janitorial Department for one week where she earned $1.30 less per hour in regular wages and $1.95 less per hour in overtime wages.

With respect to plaintiff's one week placement in the Janitorial Department, defendants

21

contend that plaintiff was placed in that Department based on the manning process, plaintiff's seniority, the seniority of her fellow workers, her work restrictions as well as the work restrictions of her fellow employees.  The Court notes that the Janitorial Department is still part of the one of the Plant Utility Departments and is therefore not technically a demotion but a lateral move within the Department.  Moreover, plaintiff selected the Janitorial Department as her third group preference out of a total of seven possible work areas.  It is undisputed that Kyle Thurston who filled the last slot in the Main Plant Maintenance Department had more seniority than plaintiff. The Court finds that plaintiff's placement for one week in the Janitorial Department, a group preference she selected as her third choice out of seven, is not an adverse employment action. However, even assuming that it is an adverse employment action, defendants have presented evidence that plaintiff's placement in this Department was based solely on the manning process which involved an assessment of plaintiff's seniority and work restrictions.  This has more than satisfied defendant's burden to present a non-discriminatory reason for its actions in placing her in the Janitorial Department for one week.  Plaintiff has failed to present evidence that this reason is a pretext for discrimination.

Plaintiff also alleged in her complaint that defendant Marecek also demanded that she have her hand grinding restriction lifted or she would not be allowed to return to the Bar Mill Production Department while male employees with similar medical restrictions were allowed to work  without any problem or interference.  However, the "evidence" submitted by plaintiff in support of this claim is wholly conclusory.  She states that it was "well known that Marecek did not like her and did not subject male employees to the same disrespect.  However, plaintiff does not provide the name or factual circumstances of any male employee who is alleged to have gotten special consideration by Marecek.  Rather, plaintiff relies solely on the deposition testimony of her co-worker, Debra Bader, who testified that Marecek "hated" plaintiff, but Bader

provides no details of Marecek's alleged hatred of plaintiff other than stating it was "common

knowledge on the floor" and was "the talk of the bar mill."  Bader further testified that Marecek

"was going to go out of his way to do something about [plaintiff.]"

      Bader stated that she saw Marecek go "beserk" on plaintiff after she dropped the billet.

She said Marecek went "crazy" and "scream[ed]" at plaintiff in front of a group of people,

"go[ing] up one side of [her] and down the other."  Bader said his manner toward plaintiff was

very demeaning.  Even assuming the truth of Bader's claims, they establish at most, that Marecek

did not like plaintiff and that they may have had an unpleasant working relationship.  There is

nothing in Bader's statements which establish that Marecek's words or actions towards plaintiff

were based on animus based on her sex or that he treated her differently than male employees

because she was a woman.  The Court notes that the record may support a claim that plaintiff's

work environment was stressful and unpleasant, crediting her allegation that Marecek was "out to

get her" and made a spectacle out of her on the occasion when she dropped the billet.  However,

there is no indication that this alleged abuse was based on plaintiff's sex.  As recently stated by a

fellow district judge in a similar case,  Title VII does not "prohibit employment decisions based

on personal animosity or a poor working relationship. . . . [the] statute is [not] 'a civility code ...

making actionable the ordinary tribulations of the workplace.'"  *Westerman v. General Nutrition*

*Corp.*, 2007 WL 320796, *5 (W.D. Pa. January 30, 2007) (citing *Gharzouzi v. Northwestern*

*Human Servs. of Pa.*, 225 F.Supp.2d 514, 534 (E.D. Pa . 2002) and *Davis v. City of Lake Park,*

*Fla.*, 245 F.3d 1232, 1238 (11th Cir.2001)).

      Plaintiff also alleges in her complaint that she was denied safety equipment such as boots

and gloves that were routinely provided to men.  However, plaintiff has not directed the Court to

the identities of any male employees who were provided specific equipment that she was denied.

Plaintiff's counsel has attached a list of employee names with codes that seem to correspond with

safety equipment purchased by the company, but these records, standing alone, prove nothing

insofar as plaintiff's claim that she was denied equipment while men were not.  As a further

matter, plaintiff expressly acknowledged during her deposition that supervisor Joe Mack

measured her hands and ordered safety gloves for her that fit her hands

The Court finds that plaintiff has failed to support her allegations of disparate treatment

and/or gender discrimination under Title VII and the NYHRL with evidence in admissible form.

Thus these claims against defendants must be dismissed.

2.   Hostile Work Environment

A hostile work environment claim requires a showing that the workplace was so severely

permeated with discriminatory intimidation, ridicule, and insult that the terms and conditions of

her employment were thereby altered so as to create an abusive working environment.  *See Perry*

*v. Ethan Allen, Inc*., 115 F.3d 143, 149 (2d Cir. 1997).  Whether a work environment is

sufficiently abusive to be actionable under Title VII depends on all of the circumstances of a

given situation, including "the frequency of the discriminatory conduct; its severity; whether it is

physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably

interferes with an employee's work performance."  *Harris v. Forklift Sys*., *Inc*., 510 U.S. 17, 23

(1993).  As a general rule, incidents "must be more than episodic; they must be sufficiently

continuous and concerted in order to be deemed pervasive."  *Perry*, 115 F.3d at 149 (citation and

internal quotation marks omitted).  Isolated acts, unless very serious, do not meet the threshold of

severity or pervasiveness.  *See Brennan v. Metropolitan Opera Ass'n, Inc.*, 192 F.3d 310, 318 (2d

Cir. 1999); *Quinn v. Greentree Credit Corp.*, 159 F.3d 759, 768 (2d Cir. 1998).

In the present case, plaintiff has presented evidence of only one incident between she and

Marecek where she was allegedly berated for dropping a billet on the floor.  Assuming that the

incident occurred as alleged by plaintiff, the Court notes as referenced above that there is no

24

evidence that this incident had anything do to with plaintiff's sex.  Even taking into account the hostile unpleasant nature of the encounter between plaintiff and Marecek, there is nothing about Marecek's words or actions that suggests he was yelling at plaintiff or making an example of her based on her sex.  Indeed, if Debra Bader is to be taken at her word, Marecek simply did not like plaintiff and there is no evidence that his dislike of her was based on her gender.  After review of the entire record, the Court finds no evidence to support plaintiff's claim that she suffered from a hostile work environment created by defendants.  Consequently, these claims under Title VII and the NYHRL must be dismissed.

3     Retaliation

Plaintiff raises a number of new retaliation claims in response to defendants' motion for summary judgment.  First, plaintiff contends that she complained to defendant Marecek that she was being sexually harassed by a fellow employee Brian Allen and that he retaliated against her for reporting the sexual harassment by pulling her from driving a tractor at the plant.  Secondly, plaintiff makes a vague assertion that she suffered from retaliation based on a hostile work environment.  The Court notes that even assuming the truth of plaintiff's allegations regarding Brian Allen, she did not raise these allegations before the EEOC.  *See Butts v. City of New York*, 990 F. 2d 1397, 1401 (2d Cir. 1993) (A district court only has jurisdiction to hear Title VII claims that either are included in an EEOC charge or are based on conduct subsequent to the EEOC charge which is "reasonably related" to that alleged in the EEOC charge).  This exhaustion requirement is an essential element of Title VII's statutory scheme.  *Id.*  As the Second Circuit noted in *Miller v. International Tel. & Tel.,* 755 F.2d 20, 26 (2d Cir. 1985), with respect to an analogous EEOC charge requirement in the Age Discrimination in Employment Act, "[t]he purpose of the notice provision, which is to encourage settlement of discrimination disputes through conciliation and voluntary compliance, would be defeated if a complainant could litigate

25

a claim not previously presented to and investigated by the EEOC." *See also Stewart v. United States Immigration and Naturalization Serv.*, 762 F.2d 193, 198 (2d Cir.1985) ("the purpose of the [Title VII] exhaustion requirement ... is to give the administrative agency the opportunity to investigate, mediate, and take remedial action ...").

The Second Circuit recognizes three kinds of situations where claims not alleged in an EEOC charge are sufficiently related to the allegations in the charge that it would be unfair to civil rights plaintiffs to bar such claims in a civil action. *See Butts*, 990 F. 2d at 1402. The Circuit  loosely refers to these claims as "reasonably related" to the allegations in an EEOC charge. *See id.* While the three are each animated by the common notion of fairness to civil rights litigants, their "reasonableness" derives from separate rationales. *See id.:*

> The first type of "reasonably related" claim we have recognized is essentially an allowance of loose pleading.  Recognizing that EEOC charges frequently are filled out by employees without the benefit of counsel and that their primary purpose is to alert the EEOC to the discrimination that a plaintiff claims she is suffering, we have allowed claims not raised in the charge to be brought in a civil action where the conduct complained of would fall within the "scope of the EEOC investigation which can reasonably be expected to grow out of the charge of discrimination."

*Id.* The second type of "reasonably related" claim is one alleging retaliation by an employer against an employee for filing an EEOC charge. *See id.* The third type of reasonably related claim is where a plaintiff alleges further incidents of discrimination carried out in precisely the same manner alleged in the EEOC charge.

In the present case, plaintiff's allegation that she was sexually harassed by Brian Allen does not fall into any of the above categories of reasonably related categories.  Plaintiff's administrative complaint to the EEOC referenced the fact that she was discriminated against on the basis on her alleged disability.  She stated she was treated differently from male employees because she was denied safety equipment and that her supervisor, defendant Marecek, berated her

in front of her fellow employees for dropping a billet on the floor.  There is nothing about these allegations that is connected or related to the claim that she was sexually harassed by Brian Allen and then retaliated against for complaining about the harassment.  Based thereupon, the Court finds that plaintiff's retaliation claim based on alleged sexual harassment by Brian Allen must be dismissed.

Insofar as plaintiff's assertion that she suffered from a "retaliatory based hostile work environment," the Court is not even sure what she means by this allegation since she provides no facts or evidence in support of this new claim.  In any event, as referenced above, the claim was not presented to the EEOC, or for that matter, raised at any time prior to filing opposing papers to defendants' motion.  For these reasons, plaintiff's claim of retaliation based on a hostile work environment must be dismissed.

E.    Breach of Contract

It is undisputed that plaintiff was a member of a collective bargaining unit and had a grievance procedure for addressing any alleged violations of the agreement between her union and Special Metals.  Short of demonstrating the existence of a separate contract between she and Special Metals that provided a different or separate agreement for resolving disputes, her breach of contract claim must be dismissed.

F.    Intentional Infliction of Emotional Distress

As argued by defendants, plaintiff's claim for intentional tort against defendant Marecek arising from the incident wherein he allegedly berated her verbally in front of her co-workers for dropping the billet is untimely.  The incident occurred on May 28, 2008.  Plaintiff commenced the present action on July 28, 2009, more than one year after the incident occurred.  Given New York's statute of limitations of one year for intentional torts, see N.Y. Civ. Prac. L & R § 215, the claim is untimely and must be dismissed.

27

IV.    CONCLUSION

Based on the foregoing, the Court finds that plaintiff has failed to raise a triable issue with respect to any of her federal employment discrimination claims and all but two of her state employment discrimination claims.  Because the Court elects to dismiss all of the federal claims in the complaint, the Court will not exercise its supplemental jurisdiction to address plaintiff's remaining state law claims.  Consequently it is hereby

ORDERED that defendants' motion for summary judgment (Dkt # 24) dismissing plaintiff's complaint is GRANTED in part and DENIED in part; and it is further

ORDERED that plaintiff's employment discrimination claims pursuant to the ADA and TITLE VII are dismissed with prejudice; and it is further

ORDERED that plaintiff's breach of contract and intentional tort claims are dismissed with prejudice; and it is further

ORDERED that plaintiff's employment discrimination claims under the NYHRL are dismissed without prejudice.

IT IS SO ORDERED.

Date:   September 30, 2011
        Syracuse, New York

_____
Norman A. Mordue
Chief United States District Court Judge

28